(103 So. 537)

No. 26689.

## FERNANDEZ v. WILKINSON.

(March 2, 1925.  Rehearing Denied March 30, 1925.)

*(Syllabus by Editorial Staff.)*

1. **Evidence ⊙►10(1)—Common knowledge that certain back lands situate in lower stretches of Mississippi river are not cultivatable.**

It is matter of general knowledge that lands situated in lower stretches of the Mississippi river lying 1½ to 3 miles back from the river, are not cultivatable, but consist of salt marshes interspersed with deep cypress swamps and are almost inaccessible.

2. **Vendor and purchaser ⊙►44—Sales; conclusively presumed that one selling immovable for less than half its value acts under error of fact sufficient to invalidate sale.**

Under Rev. Civ. Code, arts. 1860, 1861, and 2589, it is conclusively presumed that he who sells an immovable for less than half its value is acting under an error of fact sufficient to invalidate sale, and this even though vendor knew and expressly declared that he knew value of property exceeded twice price received.

3. **Vendor and purchaser ⊙►44—Sales; evidence held to show that sale of land was speculative and value thereof conjectural, precluding vendor from rescinding sale for lesion beyond moiety.**

In suit by vendor, under Rev. Civ. Code, arts. 1860, 1861, 1862, 1871, 2589, 2590, 2591, and 2595, to rescind a sale of marsh and swamp land situate in lower stretches of Mississippi river on ground that price received was less than one-half its value, in that it contained much valuable cypress timber, evidence *held* to show sale was speculative, and value of immovable merely conjectural, and hence vendor was not entitled to rescission.

Appeal from Civil District Court, Parish of Orleans; Sam A. LeBlanc, Judge.

Action by Mrs. Carmen De Lesseps Fernandez against James Wilkinson.  Judgment for defendant, and plaintiff appeals.  Affirmed.

Hubert M. Ansley, of New Orleans (Frank W. Hart, of New Orleans, of counsel), for appellant.

James Wilkinson, of New Orleans, in pro. per.

ST. PAUL, J.  On August 19, 1921, plaintiff and defendant executed the following "act of sale," which is self-explanatory, to wit:

Whereas, the undersigned Mrs. Carmen De Lesseps, widow of the late Jos. A. Fernandez, at present a resident of Terrebonne parish, state of Louisiana, originally acquired and became the owner of the lower tract on the Alliance Plantation, parish of Plaquemines, state of Louisiana, situated on the west bank of the Mississippi river at about 31 miles below the city of New Orleans, more or less, which tract of land was originally described in the title deeds of the said Mrs. Fernandez, duly recorded, as a certain tract of land fronting on the Mississippi river, measuring 9 arpents and 165 feet front on said river by *eighty arpents in depth*, bounded above by the lands formerly belonging to E. B. D. Degruy, and below by the lands of Andrew Durnford. (now known as the St. Rosalie Plantation); and,

Whereas, at the time of the foreclosure sale of said plantation against the said Mrs. Carmen De L. Fernandez, through some error only forty arpents in depth of said property was included in said foreclosure sale, leaving the

rear 40 arpents in depth of said property unsold, although both the said Mrs. Fernandez and the purchaser at said sale and their subsequent vendees, including the present Deer Range Planting Company, Incorporated, now in bankruptcy, have always treated and held said property as the property of the purchaser at aforesaid foreclosure sale and the subsequent vendees of said property; and,

Whereas, owing to long adverse possession by said subsequent purchasers the title of the said Mrs. Fernandez has been greatly weakened; and,

Whereas, in order to give an opportunity to the Deer Range Planting Company, Incorporated, to perfect any rights of ownership by its long-continued possession it may have acquired in the property, James Wilkinson, now one of the attorneys of the said Deer Range Planting Company, Incorporated, in bankruptcy, considers it advisable to acquire any right, title and interest the said Mrs. Fernandez may now have in the property, same to be tendered by him to the said bankruptcy company in due course; and,

Whereas, the said Mrs. Carmen De L. Fernandez has agreed to sell to the said James Wilkinson, for the sum of five hundred dollars, any and all rights she may have in aforesaid tract of land without, however, warranting the title conveyed by her. Same being her separate paraphernal property:

Now in consideration of the said sum of five hundred dollars being two hundred and fifty dollars cash and a note for the sum of two hundred and fifty dollars, payable Jany. 1st, 1922, at room 212 Masonic Temple, New Orleans, given by the said James Wilkinson to the vendor and the receipt of which is duly acknowledged, the said vendor, Mrs. Carmen De L. Fernandez does by these presents, sell, assign, and transfer for above price, any and all her rights, title and interest of whatever description owned by her in and to said certain tract of land beginning forty arpents from the Mississippi river and constituting the rear lower concession of the Alliance Plantation in the parish of Plaquemines, west bank, measuring nine (9) arpents, 165 feet front behind said first concession and extending back forty arpents in depth between parallel lines, the rear of said property being eighty arpents from the river, said property being bounded below by the rear concession of the St. Rosalie Plantation, now the property of the Deer Range Planting Company, Incorporated, and above by the rear concession of the Alliance Plantation, adjoining the tract herein conveyed, now the property also of the Deer Range Planting Company, Incorporated.

This sale is made without warranty by the vendor.

### I.

[1] From this it will be seen that the land sold begins at a distance of 40 arpents, about a mile and a half, from the Mississippi river, and extends back to the 80-arpent line, about three miles from the river. And it is a matter of general knowledge, with reference to the lower stretches of the Mississippi river, that lands so situated are not cultivatable; that they consist of salt marshes interspersed with deep cypress swamps, and are almost inaccessible; that their sole value at present lies in the cypress timber thereon, which in turn depends upon the means available for profitably transporting same to some sawmill. The *evidence* shows that *these* lands are of that character.

### II.

In accordance with the purpose declared in the act of sale, defendant promptly tendered the lands to the trustee in bankruptcy of the Deer Range Planting Company, who, however, declined to take them, partly for lack of funds, and partly because he did not feel authorized to buy them. At any rate, he declined to buy. Whereupon defendant, being without means to meet the credit portion of the price, obtained the $250 from his brother, to whom he thereupon ceded (verbally and inter amicos) a half interest in his holding. The note was duly paid at maturity, and payment accepted.

### III.

About a year afterwards, to wit, February, 1923, one Edwin S. Gardiner, acting as agent for his sister who owned the lands adjoining, protested to the trustee in bankruptcy that the latter had closed to his (Gardiner's) use a certain canal running through the property of the bankrupt, through which he (Gardiner) claimed, on behalf of his sister, a right of servitude to float logs to a nearby navigable

stream, which canal, he claimed, was partly on the lands of his sister, and was necessary as a means of ingress and egress to and from his sister's lands. So far as the evidence herein shows, Gardiner took nothing by his protest; and that same evidence fails to show, or even to suggest, that any such right of servitude ever existed.

In June, 1923, defendant had his lands surveyed, which survey showed that the canal in question was wholly on the land of the bankrupt; that it ran up to, but not on, defendant's property; that at its nearest point it did not come within 10 chains (660 feet) of the Gardiner property. It showed further that Gardiner had located his logging camp at the head of said canal, upon defendant's property; and was cutting timber from said property. See Blueprint, Transcript, p. 16. Defendant thereupon notified Gardiner to cease his trespassing. Whereupon Gardiner sought out the plaintiff herein, and this suit followed, which is being conducted entirely at the expense of said Gardiner.

### IV.

The suit is one to rescind and set aside the sale from plaintiff to defendant. It is brought in accordance with express statutory provisions by which the vendor of an immovable, even though of mature age and proper understanding, may at any time within four years have such sale set aside on proving that the price received was less than half the value of the immovable at the time of its sale, unless the purchaser should elect to keep the property by making up the difference between the price paid and the just value thereof. R. C. C. arts. 1861, 1862, 1871, 2589, 2590, 2591, 2595. And plaintiff alleges that at the time she sold to defendant the just value of the property was $40,000.

Plaintiff further alleges that at the time she sold she was unacquainted with the value of the property and thought that same was of inconsiderable worth, and *unfit for any*

*purpose whatsoever;* that she did not know the amount of timber thereon or the value thereof. The *petition,* however, does not charge that defendant misled her as to such value or misrepresented anything whatsoever as to the condition of said property.

This allegation is therefore wholly irrelevant and superfluous. The property was, as we have said, *almost inaccessible;* but in this sense only, that there was little or no means of ingress and egress thereto and therefrom *for the purpose of taking profits* from the land—removing the logs, for instance. But the means of ingress and egress to and from the land *for the purpose of inspection* were ample, even though difficult. Certes, plaintiff herself, an aged and delicate gentlewoman, could not have made the inspection personally; but there was nothing to prevent her from having the inspection made by others. It was done by the surveyor and his men who marked the lines of the property; it was done by the experts and estimators whom she called on the trial of the case; it was done by Gardiner and his logging crew. And if, instead of having the property inspected before selling, plaintiff chose rather to rely upon her own judgment that the land was *unfit for any purpose whatsoever,* she could not, but for the express statutory provision above quoted, now be heard complaining of her own negligence, laches, and want of prudence in the premises. For even had defendant actually misrepresented the *value* of the property, she would still have been entitled to no relief under the circumstances. See R. C. C. 1847, No. 4. Much less can she do so when the petition makes no such charge.

[2] But, as we have said, the allegation was wholly superfluous, for this reason: The law presumes juris et de jure that he who sells an immovable for less than half its value is acting under an error of fact sufficient to invalidate the sale. R. C. C. arts. 1860, 1861. Nay, more, the presumption is so strong and *conclusive* that even if such vendor should

know and expressly declare that he knows that the value of the property exceeds twice the price received, and should even declare that it is his purpose to give the purchaser the surplus of the thing's value over the price received, and that he expressly abandons the right to rescind the sale, nevertheless the law still preserves to him that right. See R. C. C. art. 2589.

## V.

We have said that the petition does not charge that defendant practiced any fraud upon plaintiff. None the less there runs through the evidence a vein of insinuation to that effect, to wit:

"He never did say *cypress* to me, or I would not have been such a fool (as to sell for $500); he never opened his mouth about anything that was wood; always *swamp, swamp marsh, marsh,* * * * no timber, no wood, nothing but swamp and marsh, marsh and swamp. * * * *The idea never came to me to ask whether there was cypress or wood on the land; never."* (Testimony of plaintiff.)

"He told her that the land was not worth anything. * * * He never mentioned anything about cypress being on that land." (Testimony of plaintiff's grandson.)

"He said it was swamp land, and it would take a lot of money to go out and work it, but he didn't say anything about timber being on the land. He said it was swamp land. * * * He said it was worthless; that it was not of much account." (Testimony of her daughter.)

But the fact of the matter is that defendant represented to plaintiff nothing more than that the land was there and apparently her property still, though long supposed to belong to others; that same was not surveyed and was inaccessible for logging purposes at present and could not be made so except by digging canals at large expense or acquiring the right of way over other canals; but he did not know what timber might be upon the land; that he wanted the land primarily for the purpose stated in the deed, but would keep it for himself if the trustee did not want it; that it was worth no more than $500 to

him, which he would give her if she wished to take it.

The evidence shows that plaintiff took two or three weeks to consider the proposition; that she herself had lived for many years upon the plantation of which the land formed part; that her son-in-law, whom she visited often, was a practicing physician in that part of state and passed in front of the old plantation frequently, if not daily, in the course of his professional rounds; that at the end of the two weeks plaintiff declared herself satisfied with the price offered, and pronounced it a windfall. And yet "the idea never came to me (plaintiff) to ask whether there was cypress or wood on the land," although, had plaintiff known it, she "would never have been such a fool" as to sell for $500.

The evidence further shows that defendant had never been upon the property except once, and then only on the extreme rear part thereof to which the aforementioned canal ran, and did not himself know just what was on the land; that he had never been in any way interested therein except as attorney for the bankrupt estate; that he had never had the land surveyed or cruised or estimated, and was in fact merely taking a chance in case the trustee did not want the land.

Under these circumstances, the insinuation of fraud falls of its own weight.

And the fact remains that plaintiff thought the price received a God-send and was perfectly content therewith until sought out by Gardiner.

## VI.

[3] But all that is neither here nor there. Plaintiff's action is purely *statutory* as above said; and when cleared of these excrescences (error and fraud), the question still remains: Was the price received by plaintiff from defendant less than one-half the just value of the land at the time of the sale?

This issue was put squarely before a jury, prayed for by plaintiff, with a charge from

the district judge which correctly states the law at every point. And the jury, who saw and heard the witnesses and followed the case during the three days taken up by the trial in the court below, brought in a verdict (unanimously) for defendant.

Plaintiff then promptly moved for a new trial. The motion was argued before the trial judge, and taken under advisement. Ten days afterwards the new trial was denied, with well-considered written reasons.

## VII.

The oral evidence taken before the jury covers about 140 typewritten pages. We have carefully read that testimony in full in the transcript, and also the copious extracts to be found in the 75 printed pages of briefs herein filed.

It shows that sawmills will not purchase standing timber on lands which have not been surveyed; that timber cruisers will not undertake to estimate the quantity of timber on lands unless furnished with a survey of the lands; that the cost of surveying *these* lands was over $800; that *in all probability* plaintiff herein had not $800 with which to have the survey made, and even had she had them she would not have spent them for that purpose on lands which she knew she owned (as she claims) and yet had not even paid taxes on them for nearly 40 years—thus: "No, I didn't (pay taxes); *sure not*." For, although her husband often spoke to her about this place, yet "I never knew there was timber there," and so when she saw the sawmill at Myrtle Grove Plantation, which for 10 or 12 years had been cutting timber on and near this property, "I wanted to know where they got the wood, * * * I saw them working, and I wondered where they got the wood from," all of which she saw and wondered at whilst visiting her son-in-law aforesaid, who was also the parish coroner, and presumably had some knowledge of what was going on in the parish. But she made no inquiry.

Thereafter Gardiner began cutting the timber on the rear, believing doubtless that he was cutting on his sister's lands, just as Myrtle Grove believed it was cutting on its own land.

Our conclusion, therefore, accepting plaintiff's statement that she knew she still owned this land, is that she had long since abandoned it as worthless, "unfit for any purpose whatsoever," and would not have spent $800 upon it for surveys; and without this survey the land was in fact not worth paying the taxes upon it except as a speculation.

But even if we be mistaken in this, and assuming that plaintiff had the means to procure the survey and were willing to do so, nevertheless the situation is not materially changed. The evidence shows that there may be about two and a half million feet of timber in the land. But it is simply impossible from this record to find what that timber is worth. It seems certain that to float it to the nearest navigable stream about three miles of canal would have to be dug, at a cost of about $4,000 per mile exclusive of the cost of the right of way through adjoining lands. And the evidence does not show what this right of way might cost, or even that it could be obtained at all. But with such a canal built the value of the timber on the stump would be about $5.50 ($5 to $6) per thousand, or say $13,750. And if from this we deduct $12,000 for the canal and $800 for the survey, we find a balance of $950, less whatever the right of way might cost.

But the fact of the matter is that the value of cypress timber on the stump depends for the much greater part on the surrounding conditions; some may not even be worth the cost of removing it. And, again, it may be worth more to one purchaser than to another, depending on the means of transportation which may be open to the one and not available to the other; as if one man has a

canal already built on his own land, and the other has to acquire a right of way and dig his canal.

Hence, during the two years between the purchase of this property and the filing of this suit, defendant has never had an offer for it; and the nearest approach thereto has been the obtaining of an option thereon for $4,500 by one Webb. But this option has never been exercised by Webb, and is under consideration only because he owns other cypress timber nearby and has already a canal on his land coming to within a mile or two of this land. And even this option was sought only *after the survey*, without which it would not have been considered at all.

### VIII.

In Copley v. Flint, 16 La. 380, also 1 Rob. 125, and in Martin v. Delaney, 47 La. Ann. 719, 17 So. 264, this court held that the action of rescission for lesion beyond moiety was intended for the protection of those who have been driven by their necessities, or have through weakness or improvidence suffered a loss on the sale of land of more than half its value; and (in effect) that it was not intended to afford a means of speculating in real estate and on the titles thereof; hence that it might be shown what the plaintiff's pretensions, title, or claim was really worth without being confined to the mere intrinsic value of the land. Or, in other words, that all the circumstances surrounding the sale should be examined and inquired into; that, even as to the intrinsic value of lands, no conjectural or speculative values were to be considered.

In Wilkins v. Nelson, 155 La. 807, 99 So. 607, this court held that the sale of oil, gas, and mineral leases, though immovables, were not subject to attack on the ground of lesion beyond moiety. Among other reasons, the court said that their nature was such that they were not susceptible of having any intrinsic, determinable, and fixable value; that

any value which might be fixed on them would be only speculative and conjectural.

Hence we conclude that no action for lesion beyond moiety lies where the sale is speculative on the part of the vendor, and the value of the immovables sold is merely conjectural; whereas, it ought to be sufficiently certain to enable the defendant to supplement the price and keep the property. R. C. C. art. 2591.

We think the jury properly found that plaintiff had not made out a case which called for the rescission of the sale herein attacked.

### Decree.

The judgment appealed from is therefore affirmed.