FOURNET, Justice.
 

 R. Lafayette Jones instituted this suit on September 16, 1939, to rescind that certain act of sale executed by him on February 13, 1937, whereby he conveyed to the First National Bank of Ruston, Louisiana, for the recited consideration of $3,000 in cash “and other good and valuable consideration” a tract of land consisting of approximately 440 acres and being thé SEj4 and SEi/4 of the SW^/i of Section 7, and the NEJ4 and EJ^ of the NWJ4 of Section 18, T. 17 N., R. 4 W., Lincoln Parish, claiming that the real consideration for this purported sale was the cancellation of the judgment against him in favor of the bank in the amount of $1,854, which, together with interest, fees,, costs and the- redemption of the property from the state for failure to pay taxes amounted to $3,398.14 although the property was actually worth $13,200, more than twice the consideration actually paid; that at the time of the execution of the deed the defendant was negotiating to execute oil and gas mineral leases for an amount in excess of the price paid and that with
 
 *865
 
 in the month following the execution of the deed of sale it actually leased the property mineral rights for $10 an acre, or $4,400. In the alternative he alleged there was no meeting of the minds since he was to receive $3,000 in cash in addition to the cancellation of this judgment, which amount was never paid him.
 

 After the defendant’s exceptions of no cause and no right of action had been overruled, the defendant answered admitting the land was conveyed to the defendant in satisfaction of the judgment it held against the plaintiff but averring that the value of the land for oil, gas, and mineral purposes is irrelevant and immaterial to the issues in the case; further averring that the transaction, being the giving of a thing in payment of the judgment it held against the plaintiff, is not subject to the law of lesion beyond moiety. The allegations of the petition with respect to the alternative plea were denied.
 

 Before the case was tried on the merits, the plaintiff died and his widow and heirs were substituted as parties plaintiff. They elected to stand on the main demand. From a judgment of the lower court dismissing their suit, they are appealing.
 

 The record shows that the defendant bank, as a creditor of R. Lafayette Jones, being the holder of a $1,854 note, instituted suit against him on the note and to have set aside the deed he executed in 1933, at which time he was insolvent, purportedly transferring to his two married daughters 800 acres of land and other property in order to place it beyond the reach of his creditors. After judgment in favor of the bank became final on January 19, 1937, see First National Bank of Ruston v. Jones, 186 La. 269, 172 So. 155, Jones thereafter, on February 13, ill and confined to his home, executed the deed here sought to be set aside in satisfaction of this judgment. It appears that he sold the remainder of this property to his two married daughters and to his son-in-law, the latter in satisfaction of an obligation owed another bank.
 

 We think the instrument in controversy was, in fact, a giving of a thing in payment within the purview of Article 2655 of the Revised Civil Code, to be found in Title VII, treating of sale, as claimed by the defendant in its answer, but that it is, nevertheless, subject to attack on the ground of lesion beyond moiety since the giving in payment is subject to all of the rules governing ordinary contracts of sale (Article 2659) except that it is only perfected by the actual delivery of the thing. Article 2656.
 

 “Lesion is the injury suffered by one who does not receive a full equivalent for what he gives in a commutative contract. The remedy given for this injury, is founded on its being the effect of implied error or imposition; for, in every commutative contract, equivalents are supposed to be given and received.” Article 1860 of the Revised Civil Code. “The law,
 
 *867
 
 however, will not release a person of full age, and who is under no incapacity, against the effect of his voluntary contracts, on account of such implied error or imposition, except * * * 2. In sales of immovable property * * * if the price is given is less than one-half of the value of the thing sold” (Article 1861), including such immovables as are made so by destination. Article 1862. No recovery can be had, however, unless suit is brought within four years from the date of the contract between the persons of full age, and from the age of majority in the contract of minors (1876), the value of the property to be ascertained as of the date of the contract (1871) in the state in which it was at that time. Article 1870. See also, Articles 2589, 2590, Link-swiler v. Hoffman, 109 La. 948, 34 So. 34; Hyde v. Barron, 125 La. 227, 51 So. 126; Fernandez v. Wilkinson, 158 La. 137, 103 So. 537; and Blaize v. Cazezu, 210 La. 176, 26 So.2d 689, 690.
 

 This court, in the fairly recent case of Blaize v. Cazezu, supra, summarizes the principles underlying the doctrine of lesion beyond moiety in this manner:
 

 “The law presumes juris et de jure that he who sells an immovable for less than half its value is acting under an error of fact sufficient to invalidate the sale. Civ.Code, Articles 1860, 1861. This presumption is so strong and conclusive that even if the vendor should know and expressly declare that he knows the value of the property exceeds twice the price received, and should even declare that it is his purpose to give the purchaser the surplus of the thing’s value over the price received, and that he expressly abandons the right to rescind the sale, nevertheless the law still gives him that right. Civ. Code, Art. 2589; Fernandez v. Wilkinson, 158 La. 137, 103 So. 537.
 
 The one prerequisite (is) that the price paid be less than one-half the value of the property as established at the time of the sale.”
 
 (Italics and brackets ours).
 

 In discharging the burden that was theirs of establishing that the property at the time of the sale was worth more than twice the amount received for it — $7.72 an acre — the plaintiffs offered the testimony of four residents and property owners in the vicinity who valued the property in controversy, at the time the deed was executed, including the improvements and the mineral rights, at from $20 to $25 an acre. In addition, they offered in evidence two documents one showing that the bank, ten days after this sale, gave the Gulf Refining Company a mineral lease on 240 acres of the tract for a consideration of $2,400 (or $10 an acre), exclusive of lease provisions covering delay rentals, and the other showing that less than a month after the execution of the deed it leased the remaining 200 acres to the United Carbon Company for mineral purposes for a consideration of $2,000, also exclusive of delay rental payments and other provisions from which source, as to the entire tract, the bank realized the amount
 
 *869
 
 of $880 during the following two years. They also introduced in evidence another document for the purpose of showing that the Federal Land Bank of New Orleans in December of 1935, after the discovery of the gas well in the vicinity, sold a tract of land, reserving to itself a 1/4 mineral interest, for $19.75 an acre, and two other documents showing that in 1938, approximately a year after the execution of the deed, the loan value of the prop--erty in the vicinity (which is approximately half the value of the land) ranged from $7.50 to $8.33 an acre. Other evidence in the record shows the 440-acre tract was traversed by a gravel highway, was entirely fenced in with three-strand barbed wire with a smaller tract of some 40 acres inside this outer wire fenced about with hog wire; that some 60 acres of the property was open for cultivation, and the remainder, consisting mostly of meadows and pasture land that was highly suitable for cattle purposes, was also open; that there were three barns on the property, a large barn 60x100, a cow barn 40x40, and a log barn 12x20 (used as a corn crib) with sheds on each side; and that there was also a small tenant house on the property, all of which improvements were valued at $1,500. See, Hall v. Baker, 183 La. 714, 164 So. 777.
 

 The defendant, relying primarily on the holding in the case of Silbernagel v. Harrell, 18 La.App. 536, 138 So. 713, decided by the Court of Appeal for the Second Circuit, as did the trial judge who felt bound by this decision, contended that in determining the value of the land at the time of the sale the value of the mineral rights therein must be excluded, as being too speculative, and it offered testimony accordingly which showed that the property was worth about $10 an acre.
 

 We cannot quite follow the logic of this argument and the conclusion reached by the Court of Appeal in the Silbernagel case for when the plaintiff executed the deed transferring the property in controversy to the bank unencumbered by any real right toward any other person, the bank acquired the same in perfect ownership (Article 490 of the Revised Civil Code) and this, of necessity, carried with it “the ownership of all that is directly above and under it,” including the right to construct below the soil all manner of works and to dig as deep as necessary in order to draw from the soil all of the benefits it is felt might accrue. Article 505. Consequently, if that right has any value, this is an element that enters into the consideration of its value just as does the value of growing timber and other valuable attributes.
 

 The Silbernagel case, upon which the lower court based its decision, is unsound and not in accordance with law, for it is based upon the expression to be found in the case of Wilkins v. Nelson, 155 La. 807, 99 So. 607, 609 reaffirmed by this court in the case of Wilkins v. Nelson, et al., 161 La. 437, 107 So. 875, that “At
 
 *871
 
 most any value which may be fixed on the right (to explore for gas, oil, or other minerals) is contemplative, speculative, and conjectural, not to say fanciful and theoretical. The seller who sells such rights, and the buyer who buys, does
 
 so
 
 with a speculative intent, and it is a matter oT common knowledge that every real estate owner uses his own judgment in estimating the sale value of his property” (Brackets ours), and the expression to be found in the case of Lockwood Oil Co. v. Atkins, 158 La. 610, 104 So. 386, 388, to the effect that “ * * * it would be practically impossible to determine whether there had or had not been an enhancement in the value of an oil and gas lease, because from its inherent nature it is not susceptible of having anything more than a mere conjectural and speculative value. In a very recent case we said: ‘In the admitted speculative nature of the intangible right it is impossible that there could be any fixed and dependable valuation.’ Wilkins v. Nelson, [supra] 155 La. 807,
 
 99
 
 So. 607.” But a study and analysis of the Wilkins and Lockwood cases will disclose. that these expressions were nothing more than obiter, not being necessary to a decision. The Wilkins case is authority for the proposition that the provisions of the Revised Civil Code governing the right to rescind a sale because of lesion beyond moiety apply exclusively to immovables by nature and immovables by destination, necessarily excluding the sale of a mineral right, which is an immovable by disposition of law, while the Lockwood case is authority for the proposition that under the jurisprudence of this state the damages a party may recover, in addition to the return of the purchase price, where there has been an eviction, does not include the increased value of the property which has been caused by the fluctuation in the estimated value of it.
 

 In the Wilkins case the court very aptly pointed out that “There are three classes of immovables: Immovables by nature, immovables by destination, and immova-bles by the disposition of law.
 
 When Article 1862 of the Code restricted the action of lesion to immovables, it meant immovables wMch are such by their nature and not such as are made immovable by disposition of the law.
 
 This is made manifest by the special inclusion with the immovable by nature all immovables by destination, and the implied exclusion of all immovables made such by the disposition of the law. We hardly think that the language of article 1862 can be so construed as to extend the action of lesion to every real or incorporeal right and to every character of intangible property made immovable by the disposition of the law. * * * ft * * * appears that the servitude referred to in article 471 as being an immovable is one which is established on an estate. Its immovable character results from the nature of the object to which it is attached. It becomes a part of the estate and follows the es
 
 *873
 
 tate.
 
 It can hardly be contended that such a servitude, though declared to be cm immovable, would be subject to the action of lesion, independent of the estate to which it was attached or on which it was established.
 
 Even so, with respect to an immovable by destination, as long as it is attached to an immovable by nature it is subject to the action of lesion as a part of the immovable to which it is attached, but the moment the immovable by destination is detached from the immovable, it becomes a movable, and is not subject to the action.” (Italics ours.)
 

 In our opinion this is a sound and logical exposition of the law on this subject that is in keeping with the obvious intention of the redactors of the code who, in ttsing the term “immovable” in Articles 1861 and 1862 no doubt did so in the light of the definition they had given this term and its application as set out in Article 462, where we find that an immovable, in its strict sense, applies only to such things as are immovable by their nature and not to such as are so only by disposition of law.
 

 That the land, unencumbered with any mineral leases or servitudes, was worth at least $20 an acre, as claimed by the plaintiffs and testified to by their witnesses, is unmistakably established by the testimony of the defendant’s witnesses. For example, one of these witnesses, Mr. C. E. Barham, admitted under cross-examination that he had refused offers of $25 and $50 an acre for a lease on property in that vicinity owned by him in indivisión with Add Thompson (president of the defendant bank), Truett L. Scarborough (attorney who represented Jones along with Barham in the suit filed by the bank and also represented Jones in the transfer of this property to the bank in satisfaction of the judgment), and W. C. Simonton, who dealt in oil and gas property and leases. Mr. Simonton, another witness for the defendant, testified that mineral leases in the vicinity sold for as high as $100 an acre at the time of the execution of this deed. Although Scarborough in testifying for the defendant said he thought the $7.72 an acre Jones received for the property was fair and that he felt sure he had exhausted all avenues for selling or leasing the ‘ land at the time he suggested the transfer of the property to the bank in satisfaction of the judgment, volunteering the statement that he had also offered the land to Barham (his associate in representing Jones in the bank litigation), in view of the testimony of Barham and of Simonton this testimony is unimpressive. While Barham did state on direct examination that the property would not be worth over $10 an acre to him, it is to be noted that in answer to the question: “I asked you whether Mr. Scarborough made an effort to sell you the 440 acres of land before it was sold to the bank ?” he answered: “I don’t' know whether you would call it that he made an effort to sell it to me, but while he'-was handling
 
 *875
 
 the sale of the land, I talked with him concerning the deal he was going to make, and he asked me if I would be interested in paying the judgment owed and taking the deed, and I said that I believed I’d better not.”
 

 If we had any doubt that this property had a definte mineral value at the time of the execution of this deed, as established by the two mineral leases negotiated by the bank within the month following its acquisition of the property, this doubt is unquestionably dispelled' by the testimony of the defendant’s own witnesses, as above pointed out.
 

 We therefore conclude that the plaintiff has established the value of the property in controversy in the state in which it was at the tipie of the sale, including the improvements and mineral value, to be at least $20 an acre, much more than twice the amount actually paid for it, $7.72 an acre. Consequently, it is clear that the land, having been sold for less than half its just value, the purchaser may either restore the property and account for the fruits derived therefrom or keep the property by making up the difference between the price paid and its just value, with legal interest from the date the rescission was demanded. Articles 2591 and 2592 of the Revised Civil Code.
 

 For the reasons assigned, the judgment of the lower court is annulled and set aside and it is ordered that there be judgment in favor of the plaintiffs and against the defendant decreeing that the property was transferred to the bank for $3,398.14,. less than half the value of it, which value we fix at $8,800, and that it is, accordingly, subject to rescission because of lesion. The case is hereby ordered remanded to the lower court in order that, the defendant may be afforded an oppor--tunity to avail itself of the right to either return the property to the plaintiffs and account for the profits or keep it and. make proper adjustment, i. e., pay the plaintiffs the difference between the price paid and its just value, with legal interest from the date the rescission was demanded, all in accordance with law and. consistent with the views herein expressed. All costs are to be paid by the defendant..
 

 HAMITER, J., concurs in the decree.
 

 O’NIELL, C. J., takes no part.