79 So.2d 567

**Willie PIERCE**

v.

**Louis J. ROUSSEL et al.**

No. 39442.

March 21, 1955.

Jeffrey J. LeBlanc, Lockport, Knobloch & Knobloch, Thibodaux, for plaintiff-appellant.

Harvey Peltier, Miazza & Drury, Kalford K. Miazza, New Orleans, for defendants-appellees.

HAWTHORNE, Justice.

On June 26, 1946, Willie Pierce sold to Louis J. Roussel an undivided three-fourths interest in approximately 14 acres of land at Golden Meadow in Lafourche Parish for a consideration of $20,000. The act of sale describes the property conveyed and contains a stipulation that it includes the interest of the vendor in all oil, gas, and other minerals theretofore produced from the well known as Deramee No. 1 as well as any claims that he had to oil, gas, or other minerals produced or appropriated from the land, particularly his claim against the Texas Company for having produced and appropriated oil and gas therefrom. Shortly after his purchase Roussel conveyed to Dr. Francis E. LeJeune one-half of the interest which he had acquired from Pierce.

A little over two years after Roussel's acquisition, Pierce instituted this suit against Roussel and LeJeune to have the sale rescinded for fraud on Roussel's part. In his petition Pierce alleges that he agreed to sell his interest in the land in controversy because of misrepresentations and suppressions of facts by Roussel which constituted fraud under our law. In the alternative he prays that the sale be rescinded for lesion beyond moiety. After trial on the merits plaintiff's demands were

rejected and his suit dismissed. From this judgment he has appealed.

At the outset we wish to point out that plaintiff does not impute any fraud to the defendant Dr. LeJeune, and that this record does not show fraud of any nature practiced by the defendant Roussel.

For an understanding of the issues involved in this case, it is necessary that the factual background be given in some detail. Acting under a 1936 lease to which Willie Pierce was not a party, the Texas Company drilled two producing oil wells, known as Deramee No. 1 and Deramee No. 2, on a tract of land in the Golden Meadow oil field comprising approximately 31 acres. Subsequently, in 1943, this court in the case of Pierce v. Hunter, 202 La. 900, 13 So.2d 259, recognized that Willie Pierce and Felicien Duet were the owners in indivision, respectively, of a three-fourths and a one-fourth interest in approximately 14 acres of this 30-acre tract. The remaining 17 acres of the 31-acre tract were recognized as belonging to other persons. These two tracts are known as the Willie Pierce tract and the Ines Pierce tract respectively. Since the boundary line between the two tracts had never been established, it then became necessary for those interested in the tracts to determine the exact location of the two producing wells. The Texas Company withheld payment of the royalties accruing from the two wells until the boundary dispute should be settled and it was determined whether

the Ines Pierce or the Willie Pierce interests would be entitled to the past and future production from these wells. A compromise agreement was prepared to be executed by the 30 or more persons composing both the Ines Pierce group and the Willie Pierce group. Under this first proposed compromise the Willie Pierce group was to receive a 40 per cent interest in the production from the two wells, and the Ines Pierce group a 60 per cent interest. Willie Pierce, being convinced that both wells were on the tract in which he owned an interest, steadfastly refused to sign this compromise agreement, and it was eventually abandoned.

An action in boundary was instituted to have judicially determined the line between these two tracts in order to ascertain the location and ownership of the two wells. A surveyor appointed by the court made a survey which showed both wells to be located on the Ines Pierce tract. Willie Pierce, not satisfied with this survey, employed a surveyor of his own choice, but discharged this surveyor when it began to appear that his survey would also show the wells to be on the Ines Pierce tract.

While this boundary action was pending, a second compromise agreement was prepared, by which the Willie Pierce group was to receive only a 20 per cent interest, and Pierce was approached by various lawyers and other persons in an effort to have him sign this compromise agreement. He was given a copy of it and was fully in-

formed of the approximate amount which he would receive if all parties executed this compromise. But, as in the case of the first compromise, he steadfastly refused to execute it.

Counsel for appellant argue that, since Willie Pierce was unable to speak English or read and write, he did not fully understand the details of this compromise, but the record shows that this is not true. Although Pierce was illiterate, he was far above the average in intelligence, was a shrewd business man, was aware of his rights and interests, and was fully capable of protecting them. He took the compromise agreement to numerous attorneys, who explained it to him in detail. Some of these attorneys spoke French, and the others talked with appellant through interpreters. Moreover, he obtained through a friend the records of the Department of Conservation showing the amount of production from the two wells. Apparently not satisfied with the explanation of the various attorneys with whom he had discussed the matter, he employed his own attorney, who accompanied him to New Orleans to see Mr. C. Ellis Henican and Mr. Oliver P. Carriere, prominent attorneys who had prepared the agreement, and Pierce through his attorney discussed this document at length with them. At his attorney's request the Texas Company furnished full information of the total production in barrels from the wells and its value in dollars and cents. Appellant's attorney then computed that

$11,000 was the amount which would be received by Pierce in the event the compromise was signed by all claimants, and gave this information to Pierce in March, 1946, a few months before the sale of his interest to Roussel.

It will thus be seen that at the time of the sale the Ines Pierce group and the Willie Pierce group had been disputing the ownership of the two wells for almost three years, and during this entire time some of the interested parties had been trying to effect a compromise without success. During this period of negotiations Willie Pierce persistently refused to execute any compromise agreement, saying on numerous occasions that he only wanted what was in his net and was not worried about what was in the other fellow's net. He stated that, as far as he was concerned, there was not going to be any compromise, and that, if he could get his price, he would sell.

The deed which appellant seeks to set aside on the ground of fraud was executed in June, 1946, and at that time it was by no means certain that any agreement would ever be reached by all claimants in both groups. Even if Willie Pierce had been willing to sign the compromise agreement, one or more others whose signatures were necessary had also refused to sign the agreement, and none of the claimants could receive any amount from the accrued production from the two wells until all had signed. Moreover, the boundary suit was

pending in court, and, should the court determine that the two wells were on the Ines Pierce tract, then the Willie Pierce group would receive nothing from the past or future production from these wells. Furthermore, the holder of the lease on the Willie Pierce tract had refused to drill any wells on this tract until the boundary line had been established between the two tracts.

This was the situation which existed at the time Willie Pierce and Roussel began negotiations for the sale of the property in question.

Having been told through a friend that the property was for sale, Roussel went to Pierce and told him that he wanted to purchase one-half of his interest in the tract. For this interest he offered $5,000, which Pierce refused, stating that he wanted to sell his entire interest. Roussel then offered him $8,000 for one-half of his interest or $16,000 for the whole. Pierce replied that he had only one price, that it was for his entire interest, and that it was $20,000. Roussel requested an option for a few days, telling Pierce that he would see a friend in New Orleans, and that, if this friend agreed to "come in on the deal", he would come back and purchase the property. On the day appointed he returned with his attorney, bringing a prepared act of sale. All parties then went to Raceland, and this deed was executed there before a notary public, who read the act of sale to Pierce and explained its contents to him in French.

It is obvious that Pierce was fully informed of what he was conveying under the terms of the deed, and, in fact, he makes no contention that he did not fully understand the transaction.

In November following this sale, the compromise agreement was executed by all parties through the efforts of Roussel, and he and his associate, Dr. LeJeune, were paid $13,000 as their share of the accrued production from the two wells as a result of this compromise. On September 2, 1948, the instant suit was filed.

Appellant would make it appear that he was an ignorant, illiterate farmer who was defrauded by Roussel, an experienced oil man. His principal charge of fraud is an alleged statement which he says Roussel made to him at the time he refused Roussel's offer of $16,000. He testified that "Mr. Roussel said if you don't want $16,000.00, if you won't sell for that price, maybe after a while you won't get anything at all and the others might get it all".

Appellant argues that Roussel knew this statement was false, and that accordingly the decision of this court in American Guaranty Co. v. Sunset Realty & Planting Co., Inc., 208 La. 772, 23 So.2d 409, 449, is authority for annulling the deed in the instant case. In that case this court said:

"The parties to contracts or deeds are not obliged by law to make any statement with reference to the title, the condition, or the value of the subject matter thereof. But, if any one of them undertakes to

speak with reference thereto, he is legally obligated to tell the whole truth and neither conceal nor suppress any material facts or information bearing upon and affecting the title, the condition, and the value of the object of the transaction. In the event the speaker is guilty of material misrepresentation or concealment, the contract or deed is vitiated by his fraud, because he deceitfully obtained the consent of the other party to the transaction."

We do not agree that this principle of law is applicable to the instant case. From the facts as set out above, it is clear that Roussel did not deceitfully obtain the consent of Pierce to sell by concealing or suppressing any material fact or information bearing upon the value of the property sold. Pierce was not an ignorant and uninformed man who was relying on Roussel's experience and knowledge of the oil business. On the contrary, Pierce had full knowledge and information of the status of the property, was fully acquainted with all the terms and conditions of the proposed compromise, knew the amount of money he would receive if the compromise was completed, and also realized that he would receive nothing from the past or future production from the two wells if they were judicially determined to be on the Ines Pierce tract. He sold what he wanted to sell for the price he himself set, and he knew what he was selling.

We do not think the statement upon which appellant relies was a misrepresenta-tion or concealment of any material fact. It was actually a true statement, because, if it was determined that the two producing wells were on the Ines Pierce tract, Willie Pierce would get none of the past or future production, and it was not certain that the compromise agreement would ever be perfected. Moreover, it was problematical that Pierce would ever have any wells drilled on his own tract because the holder of the lease on that tract had refused to drill this narrow strip of land while the boundary action was pending, and meanwhile the oil under the Willie Pierce tract was being drained by the two producing wells.

It is significant that Roussel was originally interested in purchasing only one-half of Pierce's interest, and it was due to Pierce's own insistance that Roussel was persuaded to purchase the entire interest at a price named and fixed by Pierce. If the property had been as valuable as the appellant would now have us believe, and if the defendant Roussel knew this, it is indeed strange that he would want to acquire only one-half of Pierce's interest and not the whole.

We shall now discuss plaintiff's alternative plea that the sale should be rescinded for lesion beyond moiety.

The Willie Pierce tract is low marsh land, unfit for cultivation, and has very little value except for its mineral rights. It is plaintiff's position, however,

that these mineral rights have a value greatly in excess of $40,000, and he contends that the sale should be rescinded under Article 1861, paragraph 2, of the Civil Code, which provides that in sales of immovable property the vendor may be relieved if the price given is less than one-half of the value of the thing sold. Under the holding of this court in Jones v. First Nat. Bank, Ruston, La., 215 La. 862, 41 So. 2d 811, the value of the minerals must be considered when determining the value of land in a lesion suit.

We should like to point out at the outset that it is very doubtful whether a suit for recission of the sale based on lesion can be maintained in the instant case. Pierce sold Roussel a piece of land involved in litigation, an important boundary of which was unknown. It is therefore clear that Pierce sold this land as a speculation. This court has consistently refused to recognize an action to rescind a sale based on lesion beyond moiety when the sale has been made by the vendor for a speculative purpose. Fletcher's Heirs v. McMicken, 7 La.Ann. 178; Copley v. Flint and another, 1 Rob. 125; Fernandez v. Wilkinson, 158 La. 137, 103 So. 537; see also Rosenson, Lesion Beyond Moiety in the Law of Sale, 14 Tul. L.Rev. 249, 258–259. However, we need not rest our decision on this point, as the record in this suit shows that plaintiff has failed to prove his case even if we should concede that a suit for lesion beyond moiety can be maintained.

The consideration for the sale in the instant case was $20,000, and plaintiff has the burden of proving that the property sold had a value of more than twice that amount.

In Demaret v. Hawkins, 8 La.Ann. 483, it was said:

"The right to rescind a sale for lesion beyond moiety, is the only restraint upon the liberty of the citizen to bind himself and his property according to the dictates of his judgment, and *the evidence relied on to establish that right, should be peculiarly strong and conclusive.*" (Italics ours.)

In Girault v. Feucht, 120 La. 1070, 46 So. 26, it was held that a sale of real estate may be set aside if the price given is less than one-half the value of the property sold, and that in such a case the burden is on the vendor to prove lesion beyond moiety by *evidence peculiarly strong and convincing and of such a nature as to exclude speculation and conjecture.*

In Morris v. Kleinpeter, 197 La. 758, 2 So.2d 203, 205, this court reviewed the jurisprudence in regard to the burden of proof in actions for lesion beyond moiety. After quoting with approval from Demaret v. Hawkins, supra, and Girault v. Feucht, supra, the court said in the Morris case:

" * * * The jurisprudence is uniform in this, not only that the plaintiff carries the burden of proving that the price paid was less than one-half the intrinsic value

of the property at the time the sale was made, but also that the evidence relied upon to show that fact *must be clear and exceedingly strong.*" . (Italics ours.) . See also Riviere v. Boissiere, 5 La. 382; Beale v. Ricker, 7 La.Ann. 667; Mayard v. Laporte, 109 La. 101, 33 So. 98; Smith v. Huie-Hodge Lumber Co., 129 La. 28, 55 So. 698.

Plaintiff argues that, although $20,000 was actually paid by Roussel to Pierce, the price paid for the land was only $7,000 since the defendants received $13,000 in the compromise settlement as their share of accrued royalties. This argument is not impressive. At the time of the sale, as we have pointed out above, it was by no means certain that the owners of the Willie Pierce tract would receive any royalties from the two producing wells in view of the pending boundary action, the uncertainty that a compromise agreement would ever be reached, and the indications from the two surveys that the wells were on the Ines Pierce tract. It is therefore clear that each party could gain or lose depending upon the course of future events. Under these circumstances the amount realized by means of the compromise agreement cannot be deducted from the price paid for the land, and therefore plaintiff must prove that the value of the thing sold was in excess of $40,000.

To prove the value of the land sold, plaintiff called two expert witnesses. One of them testified as to the existence of the various productive oil sands underlying the Willie Pierce tract as of June, 1946, the month in which the sale took place, but fixed no value on this oil reserve. The other expert witness testified that he had computed the amount of oil recoverable under the Willie Pierce tract as of June, 1946, and had estimated that the value of Pierce's interest in the recoverable oil was in excess of $60,000, based on the posted price of oil on the date of the sale. On cross-examination this witness was requested to put a fair market price on the Willie Pierce tract based on his estimate of the oil reserve on the day of the sale, but he declined to do so, stating that he was not in a position to say what some purchaser would pay for it.

It is to be observed that this witness did not express any opinion as to the value of the Willie Pierce tract or the market value of the mineral interest underlying the land. It is true that he fixed a value on the recoverable oil in place, but he did not take into consideration that recoverable oil is only produced in varying quantities over a long period of time, and that there is no definite assurance that oil will ever be produced and, if produced, what its value will be on the date of production.

Defendants, on the other hand, placed on the stand an expert who gave his estimate of the recoverable oil underlying the Willie Pierce tract, and on the basis of this estimate he was of the opinion that a fair value

for a royalty purchaser of Willie Pierce's mineral interest in June, 1946, was about $13,000 without any allowance for depletion. He further testified that, on the basis of the estimate of the oil reserve given by plaintiff's own expert, he would place a value of $20,000 on Willie Pierce's mineral interest as of the day of the sale.

Another factor to be considered in this case is that Willie Pierce was selling a fractional interest in the land, and that such an interest is less than the corresponding fraction of the whole interest in the property. See Hustmyre v. Waters, 186 La. 218, 171 So. 855, and cases there cited. Still another factor is that the pendency of the boundary action materially affected the market value of the land. It is therefore obvious that the market value of the land on the date of the sale was a great deal less than the value of the recoverable oil in place at that time.

■ Plaintiff's estimation of the value of the thing sold, based on the testimony of his experts, is, to say the least, conjectural and uncertain, and does not take into account the other factors which we have discussed above. Plaintiff has therefore failed to prove by clear and exceedingly strong evidence that the price given was less than one-half of the value of the thing sold, and accordingly the judgment of the lower court will be affirmed.

The judgment appealed from is affirmed, appellant to pay all costs.