HAMLIN, Justice.
Plaintiff appeals from a judgment of the trial court dismissing his suit to rescind an act of cash sale of a parcel of ground,[1] together with the improvements thereon, situated in Highland Farms Subdivision,[2] Parish of East Baton Rouge, to the defendant for a consideration of $7,000.
The facts of record are to the effect that in 1953 Charlie Thomas was indebted to a number of creditors. He approached his friend Vanderbilt Sewell, proprietor of a meat and grocery store located in Scotland-ville, Louisiana, for a loan of money to be secured by a mortgage on the instant property. For his protection, Sewell insisted on a sale of the property to him and a resale to Thomas, by which he, Sewell, would retain a mortgage. On November 13, 1953, the transaction was consummated by an act of sale with mortgage from Sewell to Thomas for a consideration of $7,000. Thomas signed a $7,000 note, payable to the order of himself at the Louisiana National Bank, Baton Rouge, La., in equal monthly installments of $112.50. By May 20, 1955, Thomas had reduced the principal to $5,823.76, and no further payments were made thereafter. During April, 1956, Sewell petitioned the Nineteenth Judicial District Court for an order of executory process and a writ of seizure and sale. Private negotations were followed by a notarial act of cash sale of the property on May 11, 1956, from Charley Thomas to Vanderbilt Sewell, for a con *914 sideration of $7,000.[3] Shortly thereafter, Sewell executed but did not date or record the following document:
“To whom it may concern:
“This is a certify That I, Vanderbilt Sewell will sell to Charley Thomas the said properity involved for amount of past due notes plus cost of court and attorney fees,
“This agreement is for thirty days after said properity has been cleared, or transactions made.
“sign: Vanderbilt Sewell”'
On July 24, 1956, plaintiff brought the present action for the rescission of the sale of May 11, 1956, supra, alleging that it should be set aside because of fraud or, alternatively, lesion beyond moiety. Alternatively, he prayed that the defendant be compelled to specifically perform the contract under which he was given the opportunity to repurchase the property.
In his appeal from the judgment rejecting his demands plaintiff appellant only urges that the trial judge erred in not finding that the price he received for the immovable involved was less than one-half of the value of the immovable at the time of the sale. LSA-C.C. Articles 1861 and 2590.
Posed for our determination is a factual finding, from the evidence adduced in the trial court, of the value of the property involved at the time of the act of sale.[4] To this finding we must apply the law.[5]
“ * * * The basis of the remedy is that a vendor, who has sustained-injury to the extent of more than one-half the value of the immovable conveyed by him, will be regarded as having acted in error or to have been imposed upon by the purchaser, irrespective of whether such error or imposition exists as a matter of fact. Articles 1860, 1861 and 2589 of the LSA-Civil Code; Fernandez v. Wilkinson, 158 La. 137, 103 So. 537, and Blaize v. Cazezu, 210 La. 176, 26 So.2d 689. Therefore, there is only one issue of fact to be decided in this type of case, i. e., whether the vendor has sold the immovable for less than one-half of its value, to be determined, according to Article 2590, as of the time of the sale. And, under the jurisprudence, the highest estimate will not generally be accepted in ascertaining the true value of the property forasmuch as all estimates above the lowest have been characterized as conjectural, the burden being upon the plaintiff to establish his case by strong and convincing proof. * * * ” Foos v. Creaghan, 226 La. 619, 76 So.2d 907, 908. See, also, Broussard v. Ketchens, 231 La. 508, 91 So.2d 775.
James W. Taylor, a qualified realtor engaged in the real estate business in Baton Rouge (called as a witness in behalf of the plaintiff), testified that the construction improvements on the property consisted of two dwellings and one metal building. He placed a valuation of $3,000 on one house, a valuation of $2,000 on the second house, and a valuation of $1,500 on the metal cor *915 ner building used as a bar. He placed an appraisal of $13,050 on the remaining land, arriving at this figure by a study of what he considered comparable sales in the vicinity, using as a norm the division of subdivisions into lots. His total valuation was $19,550.
Lowell M. Roseman, a Baton Rouge realtor called as a witness on behalf of the plaintiff, placed a valuation of $19,550 on the property. His breakdown was identical to that of Mr. Taylor, supra, and he also considered the value of the vacant land in the light of a division into lots, employing comparable sales as a criteria.
Mr. Taylor and Mr. Roseman visited the property together. They did not enter any of the buildings, nor did they observe a large pond located on the north end of the tract. Their testimony is substantially the same.
James A. Johns, a builder of houses in the vicinity, called as a witness in behalf of the plaintiff, placed a value of $17,000 on the property. He stated that he would purchase it as a whole in lots for that amount. His estimation was based on a division of the tract into lots, each lot being worth approximately $450. Mr. Johns was not offered as an expert appraiser. He testified that the pond or borrow pit on the property, measuring roughly forty by one hundred feet, would have to be filled in (100 loads at $5 per load).
Manfred Sternberg, another builder of houses in the vicinity called as a witness in behalf of the plaintiff, testified that he would pay $17,000 for the whole property. His estimation was also based on a division of the property into lots. Mr. Sternberg was not offered as an expert appraiser. He was aware of the existence of the pond on the property.
W. B. Bynum, Vice-President of the Baton Rouge Securities Company, testified that on March 12, 1956, he entered into an option agreement with Charlie Thomas (a cash consideration of $100 was given) for the purchase of the instant property for a consideration of $17,000. He stated that his interest was in placing some houses, to which he had access, on the property. His testimony does not reflect that he made an independent appraisal of the property. He said that he had been unable to secure from the bank information concerning the status of the Thomas notes, supra, and when he discovered that the property had been sold to the defendant he did not exercise the option. Mr. Bynum further testified that he told plaintiff he would assist him in buying the property back from Sewell, offering a down payment of $1,000, but that when Sewell refused to accept the offer [6] he advised Thomas to consult his attorney.
In discussing a conversation he had with Thomas after the instant sale was executed, Mr. Bynum testified:
“ * * * Charlie’s explanation was that he could pay what delinquency was plus the cost and that is where the proposition of a thousand dollars for the time being was made. Now if I might repeat this, I did tell Charlie at the time that he [Sewell] evidently has done you a favor because if the property had gone to Sheriff’s sale some of us would have gone down there and bought it for maybe eight or nine thous- and dollars, maybe for two-thirds of the appraisal price' of it and you would have gotten maybe a few hundred dollars, so it looks like he has actually done you a favor by handling it this way. * * * ”
The defendant called as a witness, Dr. Kenneth C. Miller, head of the Department of Romance Languages at Southern University, Scotlandville, Louisiana, and a licensed real estate broker engaged in buy *916 ing and selling property in' Scotlandville near Farm 120 of Highland Farms. Dr. Miller stated:
“ * * * Well primarily I looked at the terrain and I couldn’t escape the buildings on the terrain when I first saw it. I looked at the neighborhood and appraised the pieces of property around it and then I asked first to see into the houses. I went into the tavern and the other two cottages, and then I asked to walk over the property itself, and I noticed the property, the general topography of the property, the road, to see if the road was developed or undeveloped, I noticed the pond that was therein, and after I had done that, after I had seen the houses, I noticed the open ditches, I noticed the squalor that was around the property, then I offered you my opinion concerning the property.” [7]
Dr. Miller further stated:
“I would like to venture two opinions. I would like to venture the opinion as if I were buying and I would like to venture the opinion as if I were listing the property. If I were buying the property my maximum figure for the buildings and the property would be five thousand ($5,000.00) dollars. If I were listing the property I would be swayed by my customer’s valuation and at that time I would advise him that the property at best would be worth six thousand or sixty-five hundred and frankly I would not take a listing on the property at a figure beyond sixty-five hundred ($6,500.00) dollars. I would not waste newspaper advertising on a figure passed that amount.”
Dr. Miller stated that the above testimony was given with' a consideration of acreage value. lie also testified that there was a pond (40 x 80) on the property and that $1,000 would be an approximate cost of filling it. He valued the business structure at $1,000 (considering it strictly as a business property) and the two houses at $500 and $1,000, respectively. He said that the business structure was not actually worth more than $200. He further testified that if the property were divided into thirty-eight lots, measuring thirty by one hundred and twenty feet, he would place a value on it of between $6,500 and $7,000.
Israel S. Powell, a licensed real estate broker, stated that he was familiar with Farm 120, having viewed it before trial. On an acreage basis, he valued the land at $4,500. He placed a value of $900 on the metal building and $1,000 and $500, respectively, on the two houses. His estimates totalled $6,900. Considering the property as divided into lots, he placed a value of $11,000 on it.
After the evidence had been adduced by counsel, the trial judge questioned the defendant as to what price he would be willing to accept for a transfer of the property back to the plaintiff. He stated that he would accept $9,500 from the plaintiff for the property and would transfer it back to him.
The trial of this case was concluded during December, 1956; judgment was not rendered until November, 1957. In his reasons for judgment, the trial judge stated:
*917 “Realizing the difference between an opinion by an individual as to the value of property and the actual value that •could be obtained by a sale of the property and furthermore in a desire to assist Plaintiff in obtaining some equitable relief — being of the opinion he was not entitled to any legal relief — • beginning at page 229 of the transcript •of testimony, the Court called the Defendant (Sewell) to the stand and, upon interrogation, obtained from him an .agreement to sell the property back to the Plaintiff for the sum of $9,500.00. Ample time was granted to Plaintiff to secure a purchaser for the property willing to pay in excess of the $9,500.00 and though effort was made by Plaintiff to obtain such a purchaser, including soliciting one of the witnesses who testified for Plaintiff as to the value of the property, Plaintiff met with no success. I therefore feel, without in any way questioning the integrity of Plaintiff’s experts, that their opinions as to the value of the property herein involved was excessive inasmuch as a purchaser could not be found willing to pay in excess of $9,500.00 for the property.”
A review of the evidence of record convinces us that the condition of the property at the time of the sale herein involved was not that of a subdivision. The evidence does reflect that a plan existed for a division of the property into lots, but the plan had not been approved by the City Planning Board. The property was neither divided into lots, nor was it staked with proper landmarks.
In the light of the surrounding circumstances, we do not find the fact that Mr. Bynum, supra, signed an option for the purchase of the property for a consideration of $17,000 a persuasive factor in the determination of the value of the property.
There is evidence in the record that the three structures located on the property were rented and brought a maximum monthly rental of $95 (rent collections were not entirely regular). There is also some evidence to the effect that the property was considered in the light of its revenue producing feature, but no testimony was adduced to show that rental collections from the three structures — which occupied only a small part of the acreage — was a primary factor in the evaluation of the entire tract.
Weight must be given to the fact that almost one year elapsed between the time of trial and the time judgment was rendered by the trial court. During that interval, plaintiff, who could have purchased the property, failed to find anyone who would buy the property for $9,500 or more or advance him such a sum.
We believe that the evidence offered by defendant’s witnesses, supra, was affirmative. The evidence offered by plaintiff’s witnesses was speculative in part. Therefore, we agree with the conclusion of the trial judge that — •
“In the circumstances, in view of the showing by Defendant of the actual consideration of the sale and insas-much as the evidence adduced by Plaintiff fails to preponderate that the value of the property was such as to be in excess of twice the price paid, I am of the opinion that Plaintiff’s suit is without merit, * * * ”
For the reasons assigned, the judgment of the trial court is affirmed. All costs are to be paid by plaintiff.

. The property involved herein is described as follows: “A certain lot or parcel of ground, together with all buildings and improvements thereon, containing 3.15 acres, situated in Section 74, T 6 S, R 1 W, in that subdivision known as ‘Highland Farms,’ located in the Third Ward of the Parish of East Baton Rouge, Louisiana, and designated on the map on file in the office of the Clerk and Recorder made by A. G. Mundinger, C. E., January 3, 1937, as Farm One Hundred Twenty (120) bounded as follows, by Blount Street on the North, Avenue D on the East, Central Avenue on the South and Avenue E on the West, measuring two hundred forty (240') feet front on Central Avenue by a depth between parallel lines of Six Hundred (000') feet; Less and Except a lot described as follows: Beginning in the Northwest corner of Farm One Hundred Twenty (120) being the corner of Blount Street and Avenue E, thence East one hundred twenty (120) feet thence North sixty (60') feet; West one hundred twenty (120') feet to a point of beginning, being a lot sixty (60') feet by one hundred twenty (120') feet fronting on Avenue E.”

. Israel S. Powell, a witness for the defendant described the property as follows: “Farm 120 of Highland Farms is located west of the Scenic Highway and north of Southern University. I would say it is possibly six blocks north of the' north line of Southern University and possibly five or six blocks west of the Scenic Highway across the L. and A. Railroad track.”

. $7,000, which is a rounded figure, represents $5,823.76 balance due on the note, $478 interest accrued, $112 installment advanced to the bank by Sewell, $583 attorney’s fees, $105 court costs, and $16.50 cost of the act of sale, totalling $7,118.-26.

. “To ascertain whether there is a lesion beyond moiety, the immovable must be estimated according to the state in which it was. and the value which it had at the time of the sale, or at the time the option was granted if the sale be made pursuant to a valid contract of option.” USA-C.C. Art. 2590.

. “2. In sales of immovable property, the vendor may be relieved if the price given is less than one-half of the value of the thing sold; but the sale can not be invalidated for lesion to the injury of the purchaser.” LSA-C.G. Art. 1861.

. The trial judge found that the evidence offered by plaintiff failed to show that plaintiff sought to re-purchase the property within the thirty days provided therefor.

. Lowell M. Roseman, witness called in behalf of the plaintiff, admitted on cross-examination that the tavern, one of the structures on the property, was con- ' structed of sheet tin and looked “junky.”
With respect to the structure located at 306 Central Ave., Mr. Roseman stated: “ * * * It appears to be either moved into the property or wholly erected. It had a metal roof, corrugated metal, and exterior is either put on in sections or had strips nailed on it and it was all out of line there. It looks pretty shabby too.”
Mr. Roseman stated that the third structure was a substantial house. He admitted that the other two buildings were shacks. He also said that they did not have a first-class sewer system, a sanitary sewer and a collection line.