FRUGÉ, Judge.
This is a suit for specific performance arising from a lease containing an option to purchase. From a judgment in favor of plaintiff and rejecting defendant’s demands, defendant prosecutes this appeal.
On May 27, 1937 Hemenway, Inc., the predecessor of plaintiff herein, entered into a contract of lease of certain property with defendant. The lease provided for a term of twenty years, commencing June, 1937 and ending May 31, 1957. The premises were leased for a consideration of $610 per month; lessee to pay all City, Parish and State taxes; lessee to procure certain insurance; lessee to pay utility bills; lessee to make necessary repairs; and finally lessee had the right to purchase the property for the price of $60,000 at the termination of the lease upon written notice. In September of 1946 defendant authorized plaintiff to increase the insurance coverage and also stated that plaintiff’s rights under Article X of the lease (containing the option) were to remain in full force and effect. The conditions of the lease were performed. Prior to the expiration of the lease plaintiff notified defendant of its intention and desire to exercise the option. Defendant refused to convey title and this suit followed. Plaintiff has remained in possession of the premises.
*668 Plaintiff prayed for specific performance, and prayed further that upon defendant’s failure or refusal to perform that plaintiff be recognized as the owner of the property upon depositing $60,000 in the registry of court and that such judgment stand in lieu of a deed. Defendant answered and in the alternative averred that no offer of legal price was made and that the refusal to execute a deed was for “just and legal reasons”. Assuming the position of plaintiff in reconvention, defendant alleged that the value of the property at the termination of the lease was in excess of $200,000; that the rental value of the property was $2,000 per month; that the option provisions do not form a valid and binding obligation; that the value of the premises in 1937 was in excess of $120,000; that since plaintiff has not tendered a legal and valid price for the property that therefore plaintiff is a trespasser; that defendant is entitled to rent for the period of possession commencing June 1, 1957; that defendant suffered damages in the amount of $15,000; that plaintiff has failed to pay the taxes on the leased premises for that portion of the year 1957 per the lease in the amount of %2ths of $2,092.50, said amount having been paid by defendant. Prior to trial plaintiff filed a plea of estoppel on the theory that it had performed all its obligations, that defendant had accepted performance and retained the benefits flowing from the contract and therefore could not be heard to repudiate any part of it that was distasteful to him. The plea of es-toppel was referred to the merits.
The defense is basically that if the sale were permitted that it would be voidable under the rules of lesion beyond moiety. There is no question that lesion beyond moiety may be plead as a defense to a suit for specific performance of an option to purchase. Lakeside Dairies v. Gregersen, 217 La. 510, 46 So.2d 752; Ronaldson & Puckett Co. v. Bynum, 122 La. 687, 48 So. 152.
LSA-C.C. arts. 1860-1880 and 2589-2600 contain the provisions pertaining to lesion beyond moiety. LSA-C.C. art. 1860 provides that:
“Lesion is the injury suffered by one who does not receive a full equivalent for what he gives in a commutative contract. The remedy given for this injury, is founded on its being the effect of implied error or imposition; for, in every commutative contract, equivalents are supposed to be given and received.”
LSA-C.C. art. 1861 provides:
“The law, however, will not release a person of full age, and who is under no incapacity, against the effect of his voluntary contracts, on account of such implied error or imposition, except in the two following cases:
“1. In partition * * *
“2. In sales of immovable property, the vendor may be relieved, if the price given is less than one-half of the value of the thing sold; but the sale can not be invalidated for lesion to the injury of the purchaser.”
LSA-C.C. art. 1870 provides:
“When lesion is alleged to invalidate a partition or sale, the party alleging it must first prove the value of the property sold, in the state in which it was at the time of the contract, according to the usual terms of credit given on sales of property of that description. * * * ”
LSA-C.C. art. 1871 provides:
“In all questions of lesion the value of that which was the subject of the contract at the time of making it, is the rule by which the lesion is to be ascertained. * * * ”
*669 LSA-C.C. art. 1877 provides that if lesion beyond moiety is shown then:
“ * * * the purchaser may elect either to rescind the sale, or to have it confirmed on paying the full value.
LSA-C.C. art. 2589 provides that:
“If the vendor has been aggrieved for more than half the value of an immovable estate by him sold, he has the right to demand the rescission of the sale, even in case he had expressly abandoned the right of claiming such rescission, and declared that he gave to the purchaser the surplus of the thing’s value.”
LSA-C.C. art. 2590 provides that:
“To ascertain whether there is a lesion beyond moiety, the immovable must be estimated according to the state in which it was, and the value which it had at the time of the sale, or at the time the option was granted if the sale be made pursuant to a valid contract of option.”
LSA-C.C. art. 2591 provides that if lesion beyond moiety is shown then:
“ * * * the purchaser may either restore the thing and take back the price which he has paid, or make up the just price and keep the thing.”
Defendant maintains that in determining the value that it must be estimated as of 1957. In support of this proposition he relies on the Lakeside Dairies case and Ronaldson & Puckett case, supra, and LSA-C.C. art. 2590 as it was prior to its amendment in 1950 by Act No. 154. Prior to the amendment the article did not specifically provide a time for determination of lesion where the sale was by virtue of an option. In 1950 the article was amended as a result of the Lakeside Dairies case, supra, to provide the time to be used in determining the value where the sale is granted pursuant to a valid contract of option. The amended article (LSA-C.C. art. 2590, supra) provided that where the sale was pursuant to an option then the value that the immovable had at the time the option was granted was the time to use. Prior to the amendment the above cited cases interpreting an option in a lease and in view of LSA-C.C. 2590 before its amendment held that where the sale was pursuant to an option then the time to be used was the date when the option was exercised.
Plaintiff, on the other hand, maintains that the article, as amended, is a remedy, i.e. procedural, and that therefore the applicable law is LSA-C.C. art. 2590 as amended by Act 154 of 1950. Therefore, they claim, that the time to be used, under the article as amended, is the value as of 1987 when the option was granted.
While we are fully cognizant of the serious nature of the question of whether or not LSA-C.C. art. 2590 is procedural or substantive, we do not find that it is determinative of the problem at hand. Under either view, that the 1937 value or the 1957 value is to be used, the outcome would be the same. If the 1937 value is employed then defendant has not shown that the value of the property was in excess of $120,000, but in fact it appears that the value at that time was the price paid by the defendant, to-wit: $58,-000. If the 1957 value is to be used we find, as did the trial judge, that defendant has not shown that the value was in excess of $120,000 by clear and convincing evidence. In view of our finding we have pretermitted discussion of plaintiff’s plea of estoppel and consideration of the procedural questions herein posed, until such time as those questions are properly before us.
We have carefully examined several cases in which our courts were confronted with a consideration of lesion beyond moiety. We find certain expressions therein suitable to our purposes in the case at bar. In the case of Blaize v. Cazezu, 210 *670 La. 176, 26 So.2d 689, 690, Justice Rogers stated that:
“This suit is brought in accordance with the statutory provisions by which the vendor of an immovable, even though of mature age and proper understanding, may, at any time within four years, have the sale set aside by proving that the price he received was less than one-half of the value of the immovable at the time of the sale, unless the purchaser should elect to keep the property by making up the difference between the price paid and its just value. Civ.Code, Articles 1861, 1862, 1871, 2589, 2590, 2591, 2595, Fernandez v. Wilkinson, 158 La. 137, 103 So. 537.
“The law presumes juris et de jure that he who sells an immovable for less than half its value is acting under an error of fact sufficient to invalidate the sale. Civ.Code, Articles 1860, 1861. This presumption is so strong and conclusive that even if the vendor should know and expressly declare he knows the value of the property exceeds twice the price received, and should even declare that it is his purpose to give the purchaser the surplus of the thing’s value over the price received, and that he expressly abandons the right to rescind the sale, nevertheless the law still gives him that right. Civ.Code, Art. 2589; Fernandez v. Wilkinson, 158 La. 137, 103 So. 537. The one prerequisite [is] that the price paid he less than one-half the value of the property as established at the time of the sale.
* * * * * *
“Market value is usually regarded as the standard, for even where there is no available market for the property the estimate of the witness must be largely controlled by consideration of what would be a fair price if a market could be found. * * * Value is largely a matter of opinion, and where there is no market value it is more or less a matter of conjecture. * * *”
And in the case of Girault v. Feucht, 120 La. 1070, 46 So. 26, 27, Justice Land had occasion to consider the plea of lesion beyond moiety. There he stated that:
“It is pleaded, however, that the sale should be avoided for lesion beyond moiety. The vendor may be relieved if the price given is less than one-half of the value of the immovable sold. * * *
“The burden of proving the value of the property sold at the time of the contract is on the vendor. * * *
“In Demaret v. Hawkins, 8 La.Ann. [483] 484, the court said:
“ 'The right to rescind a sale for lesion beyond moiety is the only restraint upon the liberty of the citizen to bind himself and his property according to the dictates of his own judgment, and the evidence relied on to establish that right should be peculiarly strong and conclusive.’
“In the same case the court further said :
“ ‘Probable estimates are at best an inferior kind of evidence, admissible only when no better can be had, and they seldom carry conviction to the mind. In the case for instance 32 witnesses were examined, and made as many different estimates, ranging from $22,637 to $42,250.’
“In Parker v. Talbot, 37 La.Ann. [22] 25, the court said:
“ ‘As stated, the valuation varies from $2,000 to $3,000; and it is incumbent on the defendant praying in reconvention for the rescission of a sale, to make out his case with legal certainty.’
*671 “It has been held and we reiterate the ruling that:
“ ‘If the value of property is not fixed within a certain range by the evidence, the lesion is a matter of conjecture, and must be considered as not proved. Beale v. Ricker, 7 La.Ann. 667; Demaret v. Hawkins, 8 La.Ann. 483.’
“In Martin v. Delaney, 47 La.Ann. 719, 17 South. 264, the court said:
“ ‘We accept this lowest estimate because all above that is conjectural. Its value must be shown within a certain range. Parker v. Talbot, 37 La.Ann. 22.’”
In the case at bar, the estimates range from approximately $100,000 to some $200,000. The variance is greater than 100%. In such case this court can not say that the highest estimate is that which is the most accurate, nor can it say that it is the lowest that is the most probable. Under the circumstances in this case, as will be set forth hereinbelow, it is sufficient to say that defendant has not proven that the present value (1957) exceeds the amount of $120,-000.
 It would serve no useful purpose to discuss or quote extensively from other cases treating of lesion beyond moiety. However, several cases are worthy of mention as they reaffirm the sound basis of the law surrounding this subject. That there is no question that proof of lesion beyond moiety must be “with reasonable certainty” is evidenced in the case of Ronaldson & Puckett Co. v. Bynum, supra and Fleming v. Irion, 132 La. 163, 61 So. 151; there must be clear and exceedingly strong evidence that price given is less than one-half value of land, Foos v. Creaghan, 226 La. 619, 76 So.2d 907, and Pierce v. Roussel, 227 La. 438, 79 So.2d 567; Dosher v. Louisiana Church of God, 225 La. 21, 71 So.2d 868, Broussard v. Ketchens, 231 La. 508, 91 So. 2d 775; inadequacy of price must be clearly shown, Shreveport Rod & Gun Club v. Board of Com’rs, 48 La.Ann. 1081, 20 So. 293; legal certainty is required, White v. Bergstedt, 164 La. 993, 115 So. 59; value must not be left to conjecture, but must be fixed and certain, Hyde v. Barron, 125 La. 227, 51 So. 126; vendor must establish value by strong and convincing proof, Armwood v. Kennedy, 231 La. 102, 90 So.2d 793; Morris v. Kleinpeter, 197 La. 758, 2 So.2d 203; a high estimate will not recommend itself, to the court, Hyde v. Barron, supra; Foos v. Creaghan, supra; and the right to have a sale set aside for lesion is the only restriction imposed by the law upon the liberty of the citizen to bind himself on his property according to the dictates of his own judgment, and consequently proof to establish lesion must be peculiarly strong and convincing. In the case at bar the trial judge did not fix a price on the property. However, he found that defendant did not show that the value exceeded the option price to the extent that the sale could be avoided because of lesion. In effect that finding places the value in an amount less than twice the stated price (i. e. less than $120,000) and it matters not that it is not set out in figures because the sale must be consummated for the price stated in the option, i. e. $60,000. It is only in the event that he finds that the value does exceed the stated price by twice the stated amount that he should set forth what he has found to be the true value. And in such case he should so state the true value if, and only if from the evidence, testimony, and record as a whole, he can validly determine the amount without delving into the realm of conjecture. He should do so in order that the vendee may elect whether or not he desires to pay the true, just and legal amount or to withdraw from the transaction. Further discussion of lesion beyond moiety may be found in “Planiol, Traite Élémentaire De Droit Civil,” Volume 2, Part I, Nos. 1409, 1409-A, 1586— 1597.
Although the party alleging lesion beyond moiety has the burden of proving *672 it, both plaintiff and defendant offered evidence as to the value of the property. Some fourteen witnesses were called who testified as to the condition and value of the property. The trial judge analyzed the testimony of each of these witnesses, concluding that “the defendant has not sustained the burden of prov[ing] his claim of lesion.” We agree with his appreciation and interpretation of the testimony and for that reason adopt it as our own as follows, to-wit:
“The evidence on this issue is voluminous, and may be broken down into these principal categories; value of the land; replacement cost of the building; physical condition of the building and its expected term of usefulness; and opinion as to value given by relators and other witnesses familiar with property values. Additionally, after a motion to re-open the evidence was granted, the record was extended by evidence relative to the value of certain property sold after.the trial in this case had been completed, and said by defendant to be comparable to the Corbett property.
“As to the first item, the land value, it is mutually conceded that the figure is approximately $40,000.
“This lot is on street level, fronting on Jackson Street 102 feet 6 inches' and having a side on Third Street of 80 feet 6 inches.
“This location is two blocks north of the center of the main business district. Jackson Street is one of the main east-west thoroughfares and Third Street is the main north-south thoroughfare in the business area. The locality is zoned “C” commercial which permits any type of business.
“The building is five (or four and a half) stories of brick construction, with the interior construction mainly a system of wood floors, wood joists, wood beams, wood girders, and wood columns. It was erected about 1918.
“The first four floors are presently used to display furniture, household appliances, etc., while the fifth floor is used as a warehouse and radio-TV repair shop. There are three rest rooms, one each being located on the first, third and fifth floors. There is one passenger elevator and one freight elevator. A loading dock, capable of taking care of two large trucks is located on the Third Street side of the building.
“Called by plaintiff as a witness was E. M. Freeman of Shreveport, a qualified civil and structural engineer with considerable experience. He testified that he is familiar with the present structural condition of the building, having thoroughly inspected it together with its original architectural drawings. The findings of the witness are set forth in detail in the exhibit “plaintiff 16”, and it will be presently sufficient to partially quote some of the statements therein contained :
“ 'The original plans show that the structure was designed for particular usage such as a furniture store or some sort of retail store dealing in lightweight merchandise. This conclusion is determined from the type and size of structural materials used * * * the depth of the foundations, and the size of the foundations.’
“ ‘There is a major crack in the west wall about wide extending from the top of the fifth story up through the parapet. This crack is near the center of the building. * * * The crack in the west wall, mentioned above, indicates foundation settlement at the southwest corner of the building. Brickwork is spalling on the upper part of the west wall.’
“ ‘It is evident that light weight merchandise was intended because the original carrying capacity was not intended to safely sustain over about 30 lbs. per square foot of floor area.’
“ ‘The wood floors and supports of same show considerable deflection (wooden floors, beams and girders are permanently deflected, or sagging ***)***. An appreciable amount of permanent de *673 terioration is generally apparent. Seasoning cracks and shakes generally exist.’
“ ‘The wood beams and joists have a permanent sag or deflection. This sag will not be removed without damage to the building; that is, without buckling the floors and damaging the plaster. * * ¥ The wood columns and posts also have seasoning cracks and are very obvious where exposed to view. * * * ’
“ ‘There is evidence of termite destruction and considerable rotting, particularly on the ground floor, and around a number of upper story window frames.’
“The witness finds the building obsolete because of its wood construction, and also from the standpoints of its electrical wiring, lighting, plumbing, water proofing, unsatisfactory exits; exterior canopy, outmoded elevators and improper arrangements of stairways.
“Finally, we quote:
“ ‘It is my opinion that the only possible use for these premises as the premises exist today, would be for a very light mercantile use, such as a furniture store or a similar mercantile business which would not invite heavier loading than presently used. Even so, the premises, as they presently exist, could not suitable accommodate a mercantile business, as now using the premises, for too many additional years, without major modification and improvements, because of the many short comings of the building already expressed above, such as hazards to human life, inefficient or inadequate sanitary plumbing facilities, inadequate illumination or lighting, inadequate and hazardous elevators, inadequate structural stability, and substantial deterioration, which is continuing. * * *’
“The witness is of the opinion that the building is unsafe because of the defects appearing in the west wall and the dilapidated condition of the canopy over the sidewalk.
“The next witness, Charles R. Lamkin, is an Alexandria architect. He has been familiar with the building since 1937 when he supervised some renovation and repair work on it. From his knowledge of original construction and existing conditions, he is of the opinion that the future useful life of the building is approximately ten years.
“Harry K. Gravier, an Alexandria construction contractor, emphasized the need for substantial renovation and improvements.
“Malcolm Downs, apparently testifying in partial rebuttal to defendant’s witness Ross Dunbar, is the operator of a furniture store in Alexandria. He testified that as of May 31, 1957 the Corbett property would not be worth over $100,000 to him for use as a furniture store.
“J. W. Beasley, Sr., president of the Guaranty Bank & Trust Company of Alexandria, has long been familiar with the Corbett property. As a matter of fact, his company sold the property to defendant in 1936. He inspected it shortly before testifying. In his opinion it was not worth over $100,000.
“The testimony of Louis Levy, prominent local businessman and investor, is along the same line. In his opinion the property has a rental value of $1,000 per month and a sale value of. approximately $100,000. He would have been interested in buying it and would have bought it in June 1957 at that price had it been offered for sale.
“The remaining witness for plaintiff whose testimony is to be commented upon was Thomas S. Howell, an Alexandria realtor. In giving a ‘value estimate by cost approach’, he figured replacement cost (40,-000 square feet at $9.00 per foot) at $360,-000, substracted 80% for depreciation and obsolesence, being $288,000, and arrived at a depreciated present value of $72,000. To this was added the land value of $40,000 for a total of $112,000. Because of the limited life of the building (based upon the Freeman report) the witness felt that the open *674 market value would not exceed $100,000. See exhibit ‘Ptf. 21’ and addendum.
“Defendant presented two witnesses, John Skodak, Jr. and Frank Gremillion, both of. whom are associated with prominent local construction firms, and each of whom had made a detailed estimate of reconstruction cost of the building as well as an estimate of the amount necessary to put it in first class condition. According to Mr. Skodak the replacement cost [is] $386,-494, and the repair and renovation cost [is] $42,400. According to Mr. Gremillion the replacement cost [is] $359,643.96, and the repair and renovation cost is $38,000. The repair cost given by Mr. Skodak includes work on floors, [ceilings], water-proofing, windows, woodwork and plaster. The repair cost of Mr. Gremillion includes such items as painting and re-roofing.
“Max J. Heinberg, an Alexandria architect, had thoroughly inspected the building. He found it to be built of “mill” construction, a slow-burning type of accepted construction. He found the building to be structurally sound and in a reasonably good state of repair. He admitted that there were obvious deficiencies which could and should be repaired. He stated that the building, with proper repairs and renovation, would have an indefinite life, citing that such had been the case with many old buildings of similar construction in New Orleans and elsewhere.
“Another witness presented by defendant was Ross Dunbar of Clark, Dunbar, Inc., a furniture concern in Alexandria. He had worked for many years for the plaintiff company. Upon being asked by counsel if he would have paid $200,000 for the Cor-bett property on June 1, 1957, the witness replied in the affirmative.
“Also called to testify by defendant was Charles M. Waters, Jr., a prominent business man and investor of Alexandria. As a partial basis for his conclusions the witness discussed several properties in the downtown area and the rental value of the Corbett building. His estimate of present value of the property we are considering is the sum of $210,000. In arriving at this value he laid stress upon reconstruction cost less depreciation of 50%, and fixed the land value at $50,000.
“This brings us to the testimony of M. C. Gehr and James M. Chambers, two Alexandria realtors called to testify by defendant.
“Mr. Gehr is in the business of real estate [appraising] and the making of real estate mortgage loans. In making the ap-praisement of the Corbett property he used three approaches; reproduction cost less depreciation, value determined by income, and value determined by comparison. It is his opinion that all three approaches must be used, with emphasis on the comparable property value.
“By the first method he reached the following conclusions: land value of $40,000 plus reconstruction cost of the building of $360,000 (40,000 sq. ft. x $9.00), for a total of $400,000, less 50% depreciation on the building of $180,000, with a resultant total property value of $220,000.
“By the use of record values for three properties determined to be comparable, the witness arrived at a value of $200,000 for the Corbett property.
“As to the income approach, the following is taken from Mr. Gehr’s appraisal report:
“ ‘A stabilized operating statement was made using an estimated income based on rental per square foot of stores in the immediate area. The majority of commercial establishments in this city require only the ground floor and in a few instances two floors. It was found that stores are renting from $.90 to $1.50 per square foot depending on size and location. It was your appraisers opinion that $1.00 per [square] foot for the first two floors and $.25 per square foot for the top three floors was reasonable. These rental figures did not include air conditioned buildings.’
*675 “ ‘The estimate of expense was based on information obtained from the City, Parish and State Tax Collectors and insurance agents.’
“ ‘The net income was capitalized at 6% because your appraiser felt that any purchaser desiring to purchase this property would want to earn this amount on his investment.’
“The ‘net income’ spoken of. was calculated at $12,100 annually, and determined by starting with an assumed estimated income of $24,000 ($2,000 per month), from which is deducted expenses of management, insurance, depreciation and taxes totalling $11,900. Capitalizing the net income at 6% produces a figure of $200,000 as the property value.
“The final conclusion is that by consideration of the three approaches to value the property is worth $200,000.
“Mr. Chambers is the ‘dean’ of Alexandria realtors. He made only a casual examination of the building and did not profess to know about its structural condition. He did admit that it is ‘obsolete in a manner’. He arrived at a total value of $163,-200, appraising the land at $32,000 and the building at $131,200. In his calculations he used a reproduction cost of $8.00 per square foot. The witness also considered his estimate of the proper rental value for use as a furniture store, and the three properties cited by Mr. Gehr as ‘comparables'.
“Returning to the testimony of. Mr. Gehr, it is noted that the comparables he used were:
“1. Property on Third Street sold by Waters et al to Aertker et al in 1956 for $40,000, referred to as ‘comparable A’.
“2. Property on Jackson Street sold by Prosser et al to Reed Typewriter Exchange in 1949 for $24,750. ‘Comparable B’.
“3. Property on Jackson Street sold by Prosser et al to Clark, Dunbar & Dunn in 1949 for $34,100. ‘Comparable C’.
“These properties a're all in close proximity to the Corbett property, the latter two being diagonally across the street from it. Photographs of all of them appear in the Gehr report.
“In attempting to compare the value of the comparable properties with that of the subject property Mr. Gehr took cognizance of the differences in size (ground floor area and number of stories) of the buildings, all of the comparables being smaller in both respects. In order to afford comparative conditions he projected the size of the smaller buildings to equal that of the Cor-bett building in ground area and number of floors.
“ ‘Comparable A’ is a one story building. As to it Mr. Gehr reports:
“ ‘This property is % the area (one floor) of subject property. This property sold for $40,000.00. On basis of one story, this property would have sold for $64,000.00. Add to this the cost of the four floors, less depreciation, the sum of $144,000, the total would be $208,000.00.’
“ ‘Comparable B’ is also a one story building. We quote the Gehr report:
“ ‘This property is -Hi the area (one floor) of subject property. This property sold for $24,750.00. On basis of one story this property would have sold for $66,000.00. Add to this the cost of the four floors, less depreciation, the sum of $144,000.00 the total would he $210,000.00.’
“ ‘Comparable C’ is a three story building. As to it Mr. Gehr reports:
“ ‘This property is % the area of the subject property. This property sold for $34,-000.00. On basis of three story building, this property would have sold for $45,000.-00. Add to this the cost of the two floors, less depreciation, the sum of $42,000.00, the total would be $117,000.00. This building is not on a corner and therefore, from a commercial standpoint, is less desirable.’
*676 “Here it should be noted that Mr. Howell is of the opinion that ‘Comparable C’ is the only one of the mentioned properties which can be used as a comparison in this case. As to it he reports using the designation ‘A’:
“ ‘This property is approximately of the area of. the subject property. This property sold for $34,000. On basis of a three story building of the same area as subject property, it would have sold for $45,332. Reduce this value to a single floor and the figure would be one-third o'f this amount, i. e., $15,332.’
“‘The subject property is four and one-half stories. Multiply [$] 15,332 by four and one half (4j/£) and you find the sum of $67,995.’
“ ‘Comparable “A” is in the middle of the block and subject property is a corner. However Comparable “A” has an alley in the rear which allows use of total building. Subject property loses about 15% of their ground floor and the Y2 second story. This would offset any difference in value of ground.’
“There remains to be discussed the evidence submitted after the motion to reopen the case was granted, and which deals with property known as the Stonewall Hotel. This property is located at Third and Jackson Streets, across Jackson Street from the Corbett building. It sold at public auction on May 31, 1958, for the price of $152,100. The relevant facts concerning this property and the sale are fully set forth in a stipulation of counsel incorporated in the record.
“The sale was the final step in a partition suit which had been instituted by some of the Sterkx heirs against their remaining co-heirs. The suit was brought to terminate the ownership in indivisión and to partially settle an estate. For many years previously the co-owners had quarrelled over the estate and its properties, including that which we are now discussing.
“The following is quoted from the stipulation :
“ ‘3.
“ ‘It is admitted that the property in question consists of two buildings, one a one-story brick building built in about 1909, fronting approximately 25 feet on Third Street and lying in the portion of the 73.08 foot wide lot which lies more distant from the corner of Third and Jackson Streets, said small building being divided into two parts, one of which is occupied by Briden-dall’s Studio and the other by Dr. Lacy Bordelon, optometrist. The remainder of said property fronting on Third Street is occupied by a building located on the corner which was constructed as a frame building prior to 1900, which was converted to a brick building by the late Joseph Sterkx sometime between 1910 and 1912. It was used for many years partly as a restaurant and as a small hotel. This corner building has three stories. The downstairs floor is now occupied by the Standard Printing Company, an office supply store, which location is at the corner of Third and Jackson Streets, and directly opposite the Hemenway Building, which lies across Jackson Street on the opposite corner of Third and Jackson Streets. When this building was operated as a hotel, it was called Stonewall Hotel, and the building has been so designated for many years. Up to about four or five years ago, the Stonewall Hotel was operated and rooms rented upstairs. In January of 1954, the Standard Printing Company rented the downstairs and since that time the upstairs floors have been closed. The buildings are producing $950.00 rent per month.
“ ‘4.
“ ‘The sale at which the aforesaid price was paid was a public sale duly advertised, those in attendance being largely members *677 of the Sterkx family, their in-laws or representatives. The bidding at this particular sale was between the parties to the suit, no bids having been made by others, but the agent of the final purchaser, one W. C. Webb, who is a realtor of Alexandria, was authorized by Dr. Lacy Bordelon, et al, to bid as much as Two Hundred Thousand and No/100 ($200,000.00) Dollars, if necessary, to buy the property. The highest bid made by the adverse parties was the sum of One Hundred Fifty-two Thousand & No/100 ($152,000.00) Dollars, so W. C. Webb, an agent for Dr. Lacy Bordelon, et al, bid in said property at this public sale for the price shown in the said deed of One Hundred Fifty-two Thousand and No/100 ($152,100.00) Dollars.’
“ ‘5.
“ ‘It is admitted that Dr. Lacy Bordelon and his son-in-law, Dr. Roger Shaw, the optometrists who occupied a portion of the small building have had their offices in that building for a period in excess of twenty years, and that they were reluctant to move therefrom because they did not want to be disturbed and because they wished to continue to maintain their offices there, which offices and location had a professional value to them; that Drs. Bordelon and Shaw had recently spent approximately $20,000.00 improving and decorating their offices. That all of these factors and the other things recited in this stipulation influenced Dr. Lacy Bordelon and his wife, Mrs. Helen Bordelon, in their interest in acquiring the property and the price they were willing to pay for it. It is further admitted that the feeling of antagonism between Dr. Lacy Bordelon and Walter Sterkx, the Executor of the Estate of Joseph, was particularly strong.’
******
“At the out-set of discussion of this evidence, it should be said that this writer is impressed with the significance of the wide variance in value expressed by the realtors who testified; Mr. Howell, plaintiff’s witness, fixing it at $100,000; Mr. Chambers at $163,200; and Mr. Gehr at $200,000, the latter two being witnesses called by defendant. If these gentlemen are sincere in their expressions of opinion, and it is assumed that they are, then the elusive nature of the answer to the problem we are considering is emphasized by this expert testimony. Consequently, there must be careful scrutiny of the bases used by these witnesses in reaching their conclusions.
“As to the reproduction cost approach, the weight of this evidence is to the effect that this cost would be $400,000, made up of $360,000 for the building and $40,000 for the land. Mr. Gehr thinks that depreciation on the building should be figured at 50%, with the resultant value being $220,-000. Mr. Howell believes that depreciation should be figured at 80%, with the resultant value being $112,000. The Corbett building was approximately 40 years old in 1947 [1957] and is admittedly obsolescent. Accordingly, the depreciation is high, but, for all that the record shows, we may with equal justification as well use one of the suggested percentage figures as the other, or perhaps some different one.
“While, under the law, reproduction cost is to be considered in determining value, little weight is to be accorded this factor. The soundness of this rule is well demonstrated by the examples given by Mr. Howell. Particularly impressive is the demonstration in connection with the Clark-Dunbar property which is admitted by both parties litigant to be a “comparable”. Using the same reconstruction cost applied to the Corbett building and allowing the same percentage of depreciation allowed by Mr. Gehr, the value of the property is determined to be $147,600. Using the 80% depreciation figure suggested by Mr. Howell, the value becomes $66,600. Yet the property sold for $34,110. It is to be noted, however, that this sale was made in 1949, and perhaps there should be some downward adjustment in the building costs basis to properly relate the cost to the period involved. Thus, if the cost figure be re *678 duced from $9.00 to $5.00, and the same 50% he allowed for depreciation, we find a theoretical value of $87,500. It is repeated that the market value established by the sale was $34,100.
“Passing now to consideration of the test of value by means of comparing the known values of similar property as established by open market sales, it has been noted that two of the buildings suggested as being comparable are one-storied and the third has three stories. In the mind of this writer, there is considerable doubt about the soundness of using as comparables properties as dissimilar, in ground floor area and number of floors as are the Cor-bett building and the buildings referred to by the realtors testifying in the case.
“However, this may be, it is noted that Mr. Gehr attempts to make similar these actually dissimilar properties by theoretically increasing the ground floor and number of stories of the asserted comparable properties so as to make them supposedly comparable to the Corbett building. By this process the Clark-Dunbar building, for instance, which sold for $34,100, is speculated to have sold for $45,000 had it been equal to the Corbett building in ground floor area. Additionally, it is speculated that if this building had two more floors its value would hereby have been increased in the sum of $72,000, and the total sales value would have been $117,000. By a different process, Mr. Howell says that if the Clark-Dunbar building of three stories, projected in size so as to have a ground floor equal to that of the Corbett building, would have been worth $45,000, then it would have been worth $67,995 if it had been four and a half stories, because we should consider that the ground floor was worth $15,332, and this multiplied by 4^4 (as he considers the Corbett building to be a 41/2 story building) would equal $67,995.
“The mere statement of these propositions should be sufficient to convince that they are so involved in speculation and conjecture and so far removed from the realm of realism as to be practically worthless as bearing upon the issue to be resolved herein.
“In considering the income approach to determine value Mr. Gehr concludes that the subject property should produce an income of $2,000 per month. After deducting what he thinks are proper costs of ownership he capitalized the remainder with the resultant opinion that the property is worth $200,000. Again, we are dealing with speculation and conjecture because there is no positive proof in the record that this property can produce $2,000 per month in revenue.
“Commenting generally, it must be said that the testimony of the witnesses, Dunbar and Downs, both of whom are in the retail furniture business, is of little assistance in resolving the issue here presented. Each of them testified as to what the Corbett building would have been worth to him and what he would have been willing to pay for it. Such testimony involves intangibles and can hardly supply the sound footing required for determining market value.
“As to Messers. Beasley, Waters and Levy, it must be conceded that we have in them witnesses who are thoroughly cognizant of property values. However, their testimony reveals the startling fact that the variation in the range of value determined by them is 100%. Certainly, on this evidence the court is unable to reach any positive finding.
“Coming now to discussion of the 'Stonewall Hotel’ property, the evidence concerning which was introduced after the motion to re-open the case had been granted, it must first be said that it is apparent that defendant relies much, for the success of his case, upon the evidence concerning this property and the price it brought at public auction. As a matter of fact, his counsel say in their brief that ‘This particular sale was a great deal more pertinent to the issues in this case than any other sales which *679 were mentioned by the various witnesses who testified’.
“On the other hand, plaintiff’s counsel argue that very little importance is to be accorded this sale because of the circumstances surrounding it, it being pointed out that there were no bidders at the auction except two co-owners whose antagonism to each other brought about bidding which has no relation to open market value. Also it is pointed out that Dr. Bordelon has maintained his office in this building for about 20 years and the location of it had a special value to him far beyond that which an ordinary willing purchaser would have been willing to pay, and in addition Dr. Bordelon had not long before spent some $20,000 in improving and decorating his office. As a matter of fact, it is stipulated that Dr. Bordelon and his son-in-law who is engaged with him in the practice of optometry did not want to move their offices as they did not wish to be disturbed and this particular location had a professional value to them.
“To summarize, the Stonewall Hotel and Corbett properties have approximately equal ground area. The Stonewall Hotel building consists of a three story building at the corner of Third and Jackson Streets and an adjoining one story building on Third Street. The entire down stairs of both these buildings has been completely modernized and is in good condition. The upper floors of the corner building are in need of repair and are obsolete.
“In our jurisprudence the rule as to proof in lesion cases is a strict one and has been steadfastly adhered to throughout the annals of our law. A few quotations from the authorities will be sufficient: * * *
Here the trial judge properly applied the law as found in Beale v. Ricker, 7 La.Ann. 667; Demaret v. Hawkins, 8 La.Ann. 483; White v. Bergstedt, 164 La. 993, 115 So. 59; and Morris v. Kleinpeter, 197 La. 758, 2 So.2d 203.
In concluding the trial judge stated that:
“It has already been concluded that the evidence produced at the original hearing is too uncertain and conflicting to establish with any degree of satisfaction the value of the Corbett property in 1957. It is also concluded that the sale of the Stonewall Hotel property can not be accepted as establishing this value. In the first place, a single sale, even if the property be entirely comparable, would not be sufficient to provide a pattern of value. Additionally, it is apparent that the peculiar circumstances • surrounding this sale had considerable influence upon the price paid. Further the Stonewall Hotel property had been modernized and put in good condition throughout its first floor, apparently at considerable expense, and only the two upper floors of the corner building are obsolete and in need of repair. The Corbett building, on the other hand, is obsolete in its entirety and in need of substantial repairs, all of which will obviously necessitate the expenditure of a large sum of money.
“In short, this writer is not able, from the evidence, to conclude with any degree of certainty the value of the Corbett property. In this situation the defendant has not sustained the burden of proving his claim of lesion.”
From the foregoing discussion of the law and the evidence it can readily be seen that defendant has not carried his burden of proof, and has failed to show that the property was in excess of $120,000 at either the granting of the option (1937) or at the time that the provisions of the option were to be given effect in 1957.
For the foregoing assigned reasons the judgment of the lower court is affirmed. Costs to be paid by defendant-appellant.
Affirmed.